Good morning, Your Honor. May it please the Court, my name is Richard Oryaki. And please keep your voice up. Very well. Richard Oryaki, I'm pleading for settlement of Singh, the petitioner. This matter has to do with the immigration judge's denial of Mr. Singh's application for asylum, and basically on grounds that the judge concluded that Mr. Singh was a persecutor of others and therefore barred statutorily from being granted asylum. There is no support whatsoever in the record for the IJ's conclusion in this case, none. The immigration judge indicated that Mr. Singh was a police officer, a senior police officer, and therefore failed to prevent or report abuse of detainees. But before you get to that, though, didn't the IJ find him not credible? That the IJ did not specifically make a credibility determination. It found that his claim was not plausible. So I suppose that triggers the credibility issue. It did not, however, make an adverse credibility determination. Under our case law, I believe they have to make an explicit adverse credibility determination. Yes. It's your position that here he did not make an explicit adverse credibility determination? That is my position. And we indicated in the brief that we'll assume that the petitioner was credible because the IJ specifically did not make an adverse credibility determination, did not list any reasons to support an adverse credibility determination. It only mentions that the petitioner's claim was not plausible. And the reasons for his reaching that conclusion is what the brief spends a great deal of time addressing. Now, your whole argument is that he was just a guard. He guarded the gate. He guarded the gate. Did he guard – I thought it was a little bit more than that. I thought he guarded the door to the interview room. No. He guarded the gate, the main gate to the police station. The interview room is a section of the police station far removed from the gate. Where is that specifically detailed in the record? Mr. Singh testified in, I believe, that he was – that his position was mainly at the gate. I believe that's at the administrative record on pages. Bear with me a minute here. What I'm interested in is you said he was just the guard. He was just guarding the gate, the outside gate to the police station. Yes. I misunderstood the record. I want to know where that – where in the record does it say he was just guarding the gate to the outside? Yes. Let me direct your attention to that specific page in just a minute. I don't mean to eat up your time. It's quite all right. I have – But I think it does make – It might be important. Well, maybe you can make your argument, and then when you sit down, you can look for it. I will do that. While the government gets to work.  So was he standing outside the – he was standing outside the door of the interrogation room?   Yes. I do not – I do not know if that's the – if that is the only time he mentions that. If you look at page 93, where he describes that the torture cells were separate from the police station. They guarded. Also, it says in there that he did not witness torture because – Well, does it make any difference that he may not have witnessed – No, what I meant is the physical location from his station and where those things actually occurred were separate by some distance. Is it fair to say that he knew that some of the arrestees were being mistreated? Oh, yes, he knew, because according to his testimony, he could hear them screaming. He knew they were being mistreated. But that does not mean he's – Well, if he's – let's see, if he's guarding – let's take the worst-case scenario here. He's guarding the door to the interrogation room where he hears screaming. Why isn't he sort of at rock bottom, assisting? Well, let's take a look at what he did. He provided water to someone who had been abused and beaten up by the deputy superintendent of police. And for doing that, he himself was beaten up. He himself was locked up for three days. This is a head constable. He has no power, he has no authority to challenge a deputy superintendent of police when he tried to – He could have quit working for the police department. Well, eventually he did, because his life was in danger because he tried to report an unlawful killing of another detainee when the firearm this deputy superintendent of police was holding was discharged, killing that individual. He reported that, and he was threatened. If he said another thing to somebody else, he was going to be killed, his family was going to be killed. This is a head constable who had four people under his supervision. And for the immigration judge to make a leap from that position to say he's a senior police officer just doesn't make any sense. I mean, if he was – if he held a higher position than the person abusing or beating up detainees during interrogations, then he would have to actually have the power to stop something like that. Was he engaged in the arresting of these individuals? No. There's no – I don't believe there's any testimony that he ever arrested anybody. But it was your understanding, either through your conversations with your client or from reading this record very carefully, that he was only guarding the gate that led to the entrance to the police station. That is my understanding. I understand that he also went into the police station, otherwise he would not have been able to provide water to the detainee. I also understand that he was asked to participate at one point in torturing another detainee in December of 1996, and he refused. He said he couldn't do that, for which he was beaten up again. I mean, this – it doesn't make any sense that someone can conclude from all that, that he was a person of power who failed to take action. So is your argument here that substantial evidence does not support the finding that Mr. Singh assisted in the persecution of others? Absolutely. There's no evidence to support any of the immigration judge's conclusions here. Accepting his testimony is true, which I may or may not do in the end, but accepting his testimony is true, concluding that the I.J. did not, in fact, make an adverse credibility finding, I nonetheless find the testimony on page 94 of the administrative record. This is the testimony that Judge Hall pointed to, at least in part. I'm at the top of the page. He says, My duty is I should maintain law and order. Question, by maintaining law and order, does that mean you kept the detainees locked in their interrogation rooms and prevented them from escaping? Answer, no. The locks were already locked up, but I would you – and then there's some garble – but I would you devalue that none of these people should go out so we would keep a watch on them. Question, so you watched. You made sure the detainees did not leave. Yes. And you guarded those prisoners. No, because the prisoners were inside and our main gate, that was outside. I'm not sure what that means. Question, I know, but your duty was to stand outside the interrogation room and to keep them from escaping, correct? Yes, ma'am. Well, if he is in some fashion keeping these people from escaping, and while these people are in confinement and he is keeping them from being escaping, I think he is assisting in the torture within the meaning of our case law. How do you respond to that? That is the only instance where he answers a yes to such a question.  But if his main position is outside the main gate, I have trouble seeing how he is in a position to offer water to a prisoner during a break in the torture interrogation because he would be outside the main gate. But instead his testimony is, well, he cries out for water, I give him water, and then I myself am beaten. But if he is outside the main gate, he is not in a position even to hear the cries, I think. He also testified that they could hear the screams when they were being mistreated in the police station. So if this detainee that they could hear during interrogation cries out for water and he heard that, he could go give him water. Okay. Let's hear from the government and we'll give you a chance to respond. Good morning, Your Honor. May it please the Court. My name is Susan Fon and I am here on behalf of the United States. And if you could please keep your voice up. Okay. Thank you. Your Honor, this Court should affirm the immigration judge's finding that there was substantial evidence that the petitioner was not credible in establishing past persecution. Do we actually have an adverse credibility finding? Yes, Your Honor, I believe so. The I.J. gave specific cogent reasons as to No, I understand he gives reasons, but did he say, I don't find him credible? Yes, Your Honor. I mean, there's some magic words that we need to say, or at least the I.J. needs to say fairly clearly, I don't believe him. And he says things that kind of sidle up to it, doesn't ring true, not plausible. I mean, are the words that he says enough in your mind to make it clear that he has made an adverse credibility finding? I believe so, because later in the I.J.'s testimony, he says that even if the petitioner was not, was credible, and then he goes into the alternate finding of that the petitioner was a person who Well, I understand he says even if, but that doesn't say I find him not credible. I mean, I've circled the various places where he says things that kind of sound like adverse credibility. He says it is, quote, a little bit implausible. That's on page A.R. 52. He later says it seems unreasonable that a statement that he reported the incident does not appear reasonable. It would be more likely. That's on page A.R. 45. The refunded statement is not a plausible one. That's A.R. 45. Oddly enough, he talks about all the things showing up from the notary the same day, not convinced it's a plausible claim, does not ring true later on that same page. Is that enough to say this is, I mean, I.J.'s know their job, and they know how to say I do not find him credible. Yes, Your Honor. So do we have an adverse credibility finding? Not outright, Your Honor. And so what do we do? Do we assume the testimony is true? Even if assuming that the petitioner's testimony is true, the petitioner is considered to be a persecutor under the INA. This circuit has held that a mere interpreter for officers that engage in the persecution of others qualifies as a persecutor himself and was denied asylum in this country. We've done a little of your work for you, but maybe you could help us out. Tell us, in your view, what is there in the evidence that tells us that he is assisting within the meaning of the statute? Yes, Your Honor. In this case, it's more compelling than the case law presented. Petitioner admits that he was aware of the torture that was going on, and the government, based on the record, believes that Petitioner actually saw the torture that was going on because he gave specific testimony in June of 1996 where the victim asked for water. He saw he testified that his arms and legs were bound and that he was lying face up. Again, in March 1997, where he saw the head officer holding a gun to the victim's head. And in his admission, he stated that he was there at the time of the torture. Moreover, as Your Honor has pointed out, in AR-94, he actively stood and guarded and made sure that the prisoners did not leave the interrogation room, that they did not escape from torture. And so with that, we believe that. Do we know if he possessed a gun? In Petitioner's brief, it suggested that in the scenario where the three men were sent after him, Petitioner stated that he left his gun in the station, that he was not carrying it with him, and that's why he couldn't arrest the three men. So I would presume so, that he did carry a gun. So that I.J. could infer from that that when he was on guard, he was possessing a weapon. Absolutely, yes, Your Honor. And not only that, but he was a senior official. He was head constable. He was not a mere officer. He held a supervisory position within the station. It doesn't sound as though he held a supervisory authority over the torturers. That's unclear from the record. He supervises four people. Yes, Your Honor. And from his description, if we take his narrative, if we take it to be true, when he intervenes to give the man water, the other guy beats him up. That doesn't quite sound like something that his inferior would do to him. Yeah, it seems like there's that hierarchy based upon. It doesn't sound as though the torturers were under his command. At least the evidence is pretty speculative that that would be so. It was not under his command. Yeah. He did testify in his initial application that there was a directive that all Sikhs be arrested. Now, you're undoubtedly aware that the Supreme Court has sent the case of Ngozi back to the BIA for some elaboration of the standard as to what constitutes assisting within the meaning of the statute. Is there any reason, assuming that we're willing to say, for purposes of this case,  And then we go directly to the question as to whether or not he was assisting in persecution. Is it worth waiting for Ngozi, or would it give us an answer to a different question? Ngozi is separate because the context of that case was that the petitioner was under duress, and there is no such finding or holding in the record here. The petitioner acted on his own volition. He was actively guarding. As Your Honor has pointed out, the petitioner could have left any time, but he chose to stay and he chose to maintain his position as a head constable. From the initial persecution in June 1996, he didn't leave until a year later in August 1997. And so your argument is even if we wait for the BIA on remand from Ngozi to decide what's been remanded to them, the only thing the BIA is going to decide as to what constitutes coercion, and that's not an issue in this case. No, it's not, Your Honor. Okay. One thing that caught my eye about the IJ's decision, maybe you can help me with, is on page 55. Yes, Your Honor. That he says, and even if he did, then his involvement in his official capacity as a policeman and as a supervisor of other policemen when he was in the facility and either witnessed or failed to take any action against those who directly tortured and punished others. So just taking the last clause, failed to take any action against those who directly tortured and punished others. Is that part of our test? No, because in Miranda Alvarado, he was just a mere interpreter. His role was to interpret what the police officers were saying to the victim during that interrogation. So in terms of higher responsibility in actually stopping what was going on, it's not necessary. It was enough that the petitioner was there, that in terms of his level of culpability, he was aware that was going on, he made sure that it was going on by making sure that the prisoners weren't escaping. So there's a level of culpability there. Okay. I've got a question about adverse credibility finding. If we assume that we have an adverse credibility finding, as I read the record here, there's a fairly strong reason to find this man not credible, but the IJ didn't mention it. And that is his initial written application in 97 doesn't mention any of the detailed episodes that he starts to talk about in 2003. He files a correction in 2003 to add these things, and then a fairly elaborate written statement in 2003. And that's a fairly common ground upon which to find adverse credibility, is that the story you first told wasn't very good, and the story you later told gets a heck of a lot better. On the other hand, the IJ doesn't mention that. So are we allowed to consider that as a ground for supporting the adverse credibility finding? Absolutely. It's in the record, Your Honor. I think that's wrong. I mean, as a matter of law, I think we have to rely only on the adverse credibility reasons that the IJ gives. Okay. I mean, do you have case law that allows us to look beyond what the IJ relies on for purposes of adverse credibility? No, Your Honor. Okay. But there are, even with what was given, what was decided by the immigration judge, did offer specific reasons of why the Petitioner was not credible. He did. That's true. Okay. Okay. Thank you. Thank you very much. Would you like one minute? Yes, please. In Miranda-Alvarado v. Gonzalez, this Court determined that in order to determine whether an applicant assisted in the persecution of others, you have to conduct a particularized evaluation of both his personal involvement and purposeful assistance in order to ascertain culpability. From the testimony of the Petitioner in this case, he saw the detainees in their cells. He saw Gurdjieff saying, bound, hands and feet. The argument that he's there to guard them so they don't escape just doesn't make any sense. If he's bound hands and feet inside a locked cell, how is he going to escape? And if that's the case, how is the Petitioner's presence there to prevent such an escape? Okay. Okay. Thank you. Thank you very much. The case of Singh v. Holder is now submitted for decision.
judges: Hall, Fletcher W. , Paez